# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>        Plaintiff,<br><br>vs.<br><br>DANDRE MONTRELL GANTT,<br><br>        Defendant. | Case No. 20-cr-2020-CJW<br><br><br>**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTIONS TO SUPPRESS AND DISMISS ON BASIS OF SECOND, FIFTH, AND EIGHTH AMENDMENTS** |

_____

## TABLE OF CONTENTS

**Page**

I.    *INTRODUCTION*................................................................2

II.   *FINDINGS OF FACT*.......................................................3

III.  *DISCUSSION*.................................................................9

    A.   *Defendant's Motion to Suppress*...............................9

        1.   *The encounter began as a consensual encounter* ...................9

        2.   *Officer Woodward had reasonable suspicion for an investigative stop when he saw the empty holster*.................................13

        3.   *Defendant's arrest was supported by probable cause*...............19

        4.   *Whether the Stop was a Traffic Stop* ...................19

        5.   *Statements Defendant Made at the Waterloo Police Station* ......24

1

**B.** **Defendant's Motion to Dismiss on Basis of Second, Fifth, and Eighth Amendments** ............................................................**26**

    **1.** **Defendant's as-applied challenge is premature**......................**26**

    **2.** **18 U.S.C. Section 922(g)(3) is not amenable to facial attacks** ...**28**

    **3.** **18 U.S.C. Section 922(g)(3) does not violate the Second Amendment**................................................................**33**

    **4.** **18 U.S.C. Section 922(g)(3) does not violate the Eighth Amendment**................................................................**34**

**IV.** **CONCLUSION** .......................................................................**35**

## I. INTRODUCTION

On May 19, 2020, the Grand Jury charged Defendant with one count of Possession of Firearms and Ammunition by a Drug User in violation of 18 U.S.C. Section 922(g)(3). (Doc. 3.) The charges arose from an encounter with Waterloo, Iowa Police Officer Matthew Woodward on January 26, 2020.

The matters before the Court are Defendant's Motion to Suppress (Doc. 32) and Defendant's Motion to Dismiss on Basis of Second, Fifth, and Eighth Amendments (Doc. 33). The Government timely filed resistances. (Docs. 36, 37.) The Honorable Charles J. Williams, United States District Court Judge, referred the motions to me for a Report and Recommendation.

I held a hearing on Wednesday, August 19, 2020. (Doc. 41.) The Government called two witnesses: Officer Matthew Woodward and Officer Charles Nichols, both of the Waterloo Police Department. Both officers are graduates of the Iowa Law Enforcement Academy and have taken additional law enforcement training. In addition, Officer Woodward is a member of the Violent Crime Apprehension Team ("VCAT"),

which investigates gun violence in the city of Waterloo. (Woodward Hr'g Test.)[1] The Government's Exhibits 1-3 were admitted without objection. (Doc. 41.) Defendant called no witnesses and proffered no evidence. For the following reasons, I respectfully recommend that the District Court **deny** Defendant's Motion to Suppress and **hold in abeyance in part and deny in part** Defendant's Motion to Dismiss on Basis of Second, Fifth, and Eighth Amendments.

## II.    FINDINGS OF FACT

Officer Woodward testified at the August 19, 2020 suppression hearing. I found him to be a credible witness. Therefore, unless otherwise noted, the following findings have all been adduced from Officer Woodward's testimony. At approximately 1:30 a.m. on January 26, 2020, Officer Woodward parked his unmarked squad car on Fifth Street at Jefferson Street where he could observe the Briq House Bar and Grill ("the Briq House"). Although his black SUV was "unmarked," it had an interior light bar, sirens, lights on the side mirrors, and police license plates. It did not "blend in that well" and Officer Woodward thought someone behind him could tell it was a police vehicle. Officer Woodward had driven by during the night and noticed "a lot of people coming and going" from the Briq House and many cars in parking lots adjacent to the Briq House, which often means they will "have problems" at closing time. The Briq House is a "hot spot" for weapons violations, fights that spill out into the street, and recent shootings near bar closing time, which is 2:00 a.m. The 400 Group, a gang that does "the bulk of the shootings in Waterloo," frequents the Briq House. Friday and Saturday nights are the busiest nights for crime in Waterloo and 1:30 a.m. on January 26 was a Sunday morning, the "rollover" from a Saturday night. From his location, Officer Woodward could see

---

[1] Citations to hearing testimony and oral argument are to the Court Reporter's rough draft of the transcript of the August 19, 2020 suppression hearing that was provided as a courtesy to the Court. An official transcript of the hearing had not been entered into the docket at the time this Report and Recommendation was filed.

3

patrons leaving the Briq House. He watched patrons come and go from the Briq House for about ten minutes.

As he was observing the Briq House, Officer Woodward noticed a vehicle parked approximately two car lengths behind him that had fogged windows and did not appear to be running. Officer Woodward found this odd on such a cold night. Officer Woodward did not know the temperature, but there was snow on the ground. He noticed that the car was occupied by two men. He also noticed that the passenger in the front seat, who was later identified as Defendant, was leaning backward and forward in his seat. Officer Woodward thought the passenger looked familiar, but could not remember his name. He could not identify the driver. When someone exited the Briq House, Defendant would move forward as if to see who was leaving the bar. If the person was a female, Defendant moved back quickly. If the person was a male, Defendant stayed forward for a longer time and "paid more attention to the males." Defendant's movements were not slight. He would move two or three feet—when he went back in his seat, he would shift between "sit[ting] in an upright position [to] . . . pretty much almost flat." Officer Woodward estimated Defendant shifted like this ten times. Officer Woodward thought Defendant was showing interest in the males who were exiting the bar, but not the females. This was concerning because of the number of fights, disorderlies, and shootings that occur at the bar at closing time. Officer Woodward believed Defendant was targeting someone and that is why the vehicle was waiting near the bar. At one point, Officer Woodward recognized two members of the ABA ("All About Action") Gang exit the Briq House. ABA is a branch of the 400 Group. Defendant appeared to watch the men cross the street. Officer Woodward observed Defendant's head movements as Defendant watched the men. Officer Woodward believed Defendant was "tracking" the men.

Officer Woodward could read the license plate of the vehicle in his rear-view mirror and ran it through his computer. He discovered that the vehicle was registered to

4

Choroin Smith and that the vehicle's registration was expired. He then ran Smith's name through Shieldware, which provides local arrest-history, and discovered Smith was a felon who was convicted for shooting two people and was currently subject to a no-contact order.[2] While searching these records, he saw a photograph of Smith. He could not see what the driver of the vehicle looked like.

At 2:03:49 a.m., Officer Woodward decided to make contact with the driver and informed Dispatch that he was doing so. (Gov. Ex. 3 at 1.) He waited about 30 more seconds before exiting his vehicle. At this point, Officer Woodward had been watching the vehicle for about 30 minutes. Officer Woodward initially registered the encounter as "suspicious call" in the call for service record. (*Id.*) Officer Woodward exited his vehicle, walked past Smith's vehicle on the sidewalk, and saw Defendant make "furtive movements" back and forth and "mov[e] frantically" when he saw Officer Woodward. Due to Defendant's behavior, Officer Woodward decided to approach the vehicle on the passenger side instead of the driver's side. Officer Woodward's stated that reasonable suspicion was "pretty high" before he left his squad car based on watching the passenger's behavior. Officer Woodward, in full uniform—including his holstered department-issued firearm—approached the passenger-side front window, which Defendant "barely rolled down." Smith identified himself to Officer Woodward. Defendant provided his first name, "Deandre," and Officer Woodward said, "Deandre Gantt?" Officer Woodward immediately recognized Defendant because in 2018, he had been part of a VCAT team that executed a search warrant at Defendant's residence. He also arrested Defendant in 2018 for possession of marijuana and released him. Officer Woodward later swore out a warrant for Defendant's arrest for possession of marijuana, second offense.

---

[2] Mr. Smith is a co-defendant in this case. (Doc. 3.)

At 2:05 a.m., Officer Woodward radioed Dispatch for information about Defendant.  Then Officer Woodward "immediately" saw an empty gun holster in front of the car's gear shift.  Officer Woodward looked in the front and back seats as well as he could through the fogged side windows with his flashlight but could see nothing.  When he looked back through the partially-opened front window, the holster was covered with a piece of paper and Smith was in the process of removing his right hand from the area.  Officer Woodward interpreted this as Smith's attempt to hide the holster.  Officer Woodward also noticed that Smith's pants were unzipped.  Because of his training and experience, the empty holster told Officer Woodward there was likely a gun in the car.  Moreover, seeing Smith's zipper down raised Officer Woodward's suspicion "right out the window" that Smith was hiding a gun somewhere in the vehicle. Officer Woodward knew Smith was a felon and prohibited from having a firearm.  Officer Woodward believed from his training and experience that people often unzip their pants so they can quickly access a gun hidden in their waistband or crotch area in an attempt to quickly get rid of the gun. Officer Woodward also knew Defendant was "a drug user, which would prohibit him from possessing a firearm."  Moreover, as part of his job duties, he keeps track of who applies for weapons permits and he had not seen a permit for Defendant.

At this point, Officer Woodward believed that Defendant was possibly targeting someone and he was "99 percent sure" there was a firearm in the vehicle because Smith was hiding the holster.  He also knew that Smith, a felon and Defendant, a drug user, could not possess firearms.

Officer Woodward did not want to pursue the investigation alone because there were two people in a vehicle with suspected firearms.  For officer safety, he called for backup.  While he waited for backup, he engaged in small talk with Defendant and Smith to prevent them from getting "antsy" and to "put their guard down."  He said he was waiting on some information from Dispatch and, "Once they get back to me, I'll get you

6

guys out of here, okay?" (Gov. Ex. 1 at 0:33-0:36.)[3]  Officer Woodward then asked if Defendant and Smith were up to anything "fun" that night.  Smith said they were waiting for his girlfriend to get off work from a nearby hotel.[4]  Both Smith and Defendant remained in the vehicle and Smith offered Officer Woodward his driver's license, which Officer Woodward declined.  (*Id.* at 1:30-1:36.)  Officer Woodward did not take Smith's driver's license because he could tell Smith was the registered owner of the vehicle by looking at him and comparing him to the photo he had seen while going through records on his squad car computer.

Dispatch told Officer Woodward that neither Defendant nor Smith had any outstanding warrants.  However, Officer Woodward told them, "[I'm] just waiting for our system that runs drivers' license [unintelligible] they're just waiting on that, so, who knows when that shit will – hopefully soon dude. I'm cold." (*Id.* at 2:30-2:40.)  In fact, Officer Woodward was not waiting for any information from Dispatch, but was waiting for backup, and wanted to keep Defendant and Smith calm and not raise any suspicions. Defendant, Smith, and Officer Woodward continued to engage in small talk about police officer pay. (*Id.* at 2:43-3:10.)  During this entire time, both Smith and Defendant were cooperative and neither one stated that they wanted to leave or gave Officer Woodward any signs that they wanted to leave. (Woodward Hr'g Test.; Gov. Ex. 1.)

Waterloo Police Officer Charles Nichols arrived on scene in a marked patrol car at 2:08:39. a.m. (Gov. Ex. 3 at 2.)  As Officer Nichols was approaching the driver's side of the vehicle, Officer Woodward said, "32," code for the presence of a gun. (Gov. Ex. 1 at 3:21.)  Officer Woodward then told Defendant and Smith to keep their hands where he could see them and asked if there was a gun in the vehicle. (*Id.* at 3:23-3:51).

---

[3] Officer Woodward does not know why his body camera did not begin recording before this moment. (Woodward Hr'g Test.)

[4] Smith's girlfriend never arrived and Officer Woodward later discovered no such person exists. (*Id.*)

Smith answered, "If there is, it's my baby mama's," and told Officer Woodward that he would have to look for the gun himself because he did not know where it was. (*Id.* at 3:28-3:50.) Officer Nichols saw a spot on the back window that looked wiped clean, which made him think there was someone in the back seat. (Nichols Hr'g Test.) He shined his flashlight in the window and saw an AK-47 assault rifle. (*Id.*) He said to Officer Woodward, "Hey, AK in the back seat." (Gov. Ex. 2 at 1:02-l:07.) At that point, Officer Woodward believed the occupants of the vehicle were violating an Iowa statute that makes it illegal to transport a firearm inside a vehicle with ammunition in the magazine or chamber.[5]

Although Defendant originally denied there were other firearms in the vehicle, he eventually admitted there was a gun underneath where he was sitting. (Gov. Ex. 1 at 5:57-6:23.) When Defendant was safely removed from the vehicle, Officer Woodward discovered that Defendant had been sitting on two guns. (*Id.* at 6:41.) Defendant was handcuffed and detained in Officer Woodward's patrol car while officers searched the vehicle. Defendant was arrested on weapons charges when it was confirmed that he did not have a weapons permit. Defendant was interviewed at the Waterloo Police Station.

Other facts and testimony will be introduced when relevant to the following discussion.

---

[5] Iowa Code Section 724.4 provides "a person who goes armed with a dangerous weapon concealed on or about the person, or who, within the limits of any city, goes armed with a pistol or revolver, or any loaded firearm of any kind, whether concealed or not, or who knowingly carries or transports in a vehicle a pistol or revolver, commits an aggravated misdemeanor."

Officer Woodward testified that the AK-47 was loaded with "one in the chamber and I believe 19 rounds in the banana clip style magazine."

8

### III. DISCUSSION

#### A. *Defendant's Motion to Suppress*

"There are three categories of police encounters: (1) consensual communications involving no coercion or restraint, (2) *Terry* stops—minimally intrusive seizures that are significant enough to invoke the Fourth Amendment and must be supported by reasonable suspicion, and (3) full-scale arrests that must be supported by probable cause." *United States v. Flores-Sandoval*, 474 F.3d 1142, 1144–45 (8th Cir. 2007) (citing *Terry v. Ohio*, 392 U.S. 1, 20 (1968); *United States v. Johnson*, 326 F.3d 1018, 1021 (8th Cir. 2003)). The case at bar involved all three types of encounters.

Defendant argues that all evidence against him must be suppressed because he was illegally seized. Defendant frames the entire encounter between Officer Woodward and Defendant as an investigative traffic stop during which Defendant was seized beginning with Officer Woodward's initial approach. The Government, on the other hand, argues that the encounter began as a consensual encounter that did not become a seizure until Defendant was removed from the vehicle.

#### 1. *The encounter began as a consensual encounter.*

> The Fourth Amendment prohibits unreasonable searches and seizures, but "[n]ot all personal encounters between law enforcement and citizens fall within the ambit of the Fourth Amendment." *United States v. Richards*, 611 F.3d 966, 968 (8th Cir. 2010) (alteration in original) (quoting *United States v. Jones*, 269 F.3d 919, 925 (8th Cir. 2001)). Consensual encounters between officers and citizens are permitted. *Id.* at 968–69.

*United States v. DaCruz-Mendes*, No. 19-1807, --- F.3d ---, 2020 WL 4280964, at *2 (8th Cir. July 27, 2020). "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002) (citations omitted). "If a

reasonable person would feel free to terminate the encounter, then he or she has not been seized." *United States v. Lopez-Mendoza*, 601 F.3d 861, 865 (8th Cir. 2010) (citing *Drayton*, 536 U.S. at 201). A consensual encounter may become an unlawful seizure, however, if "it loses its consensual nature." *United States v. Carpenter*, 462 F.3d 981, 985 (8th Cir. 2006) (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). Even when officers have no basis for suspecting a particular individual, they can generally ask questions and request to examine his or her identification. *Lopez-Mendoza*, 601 F.3d at 865 (citing *Carpenter,* 462 F.3d at 985; *United States v. Granillo,* 288 F.3d 1071, 1075 (8th Cir. 2002)). Merely taking a person's driver's license and insurance card does not constitute a seizure. *Id.*

To seize a person, an officer must "convey a message that compliance with [his] request is required." *Id.* (quoting *Carpenter,* 462 F.3d at 985; citing *Bostick,* 501 U.S. at 434 ("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.")). A seizure may also occur if a reasonable person "believe[s] he or she is not free to refuse to answer" questions asked by a police officer. *United States v. Richards*, 611 F.3d 966, 969 (8th Cir. 2010). However, under the Fourth Amendment, police officers are not required to inform individuals of their right to refuse to answer questions. *See United States v. Vera*, 457 F.3d 831, 835 (8th Cir. 2006) (citing *Drayton*, 536 U.S. at 206–07).

> Whether an encounter is consensual depends on the facts of the case. *Jones*, 269 F.3d at 925. . . . A person is seized within the meaning of the Fourth Amendment when, under the totality of the circumstances, "a reasonable person would have believed that he was not free to leave." *Jones*, 269 F.3d at 925. Circumstances of a seizure may include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Flores*, 474 F.3d at 1103, quoting *United States v. White,* 81

F.3d 775, 779 (8th Cir. 1996). . . . Conversely, if a reasonable person feels free to "disregard the police and go about his business," the encounter is consensual. *Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991), quoting *California v. Hodari D.*, 499 U.S. 621, 628, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991). "The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S. Ct. 1975, 100 L. Ed. 2d 565 (1988).

*United States v. Munoz*, 590 F.3d 916, 921 (8th Cir. 2010). The court also considers "the officer's retention of the person's property, or an officer's indication the person is the focus of a particular investigation." *United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008) (listing all factors (citing *United States v. Ninety One Thousand Nine Hundred Sixty Dollars,* 897 F.2d 1457, 1461 (8th Cir. 1990)) (citations omitted).

The case at bar is analogous to *United States v. Griffith*, in which the Eighth Circuit held that an encounter was originally consensual. 533 F.3d at 983. In *Griffith*, officers approached a vehicle parked in the parking lot of a public housing development located in an area with a history of drug-related activity at approximately 8:30 p.m. on an early September evening. *Id.* at 981. The officers were under orders to patrol the area and exclude persons whose names were on a "trespass list" provided by the housing authority. *Id.* The officers parked about 30 feet from the vehicle and the squad car did not impede the vehicle's ability to leave the scene. *Id.* One officer approached the driver's side of the car and spoke to the driver through the window while another officer walked around the back of the vehicle "as a safety precaution." *Id.* The driver identified herself; said she did not know anyone who lived in the housing development; did not live there; and initially said she was on her way home, but later said she "was just driving around." *Id.* The driver would not provide the name of her passenger, the defendant in the case, only identifying him as "a friend." *Id.*

This answer did not satisfy the officer, who then asked the driver to exit the vehicle. *Id.* Once outside the car, the driver said the passenger was "an acquaintance who had flagged her down," whom she only identified by his street name. *Id.* The officer considered the driver's answers evasive, thought the driver "appeared irritated," and ordered the driver to sit on the curb while he questioned the defendant. *Id.* As the officer approached the vehicle, he and his partner observed the defendant lean over "as if putting something under the front seat." *Id.* at 981-82. The officers placed their hands on their weapons and ordered the defendant to show his hands while one of the officers approached the window and asked the defendant to identify himself, which he did. *Id.* at 982. The defendant was on the trespass list and was arrested for trespassing. *Id.* A search of the car yielded a firearm and led to the defendant's federal charges. *Id.*

*Griffith* held that the initial encounter between the officers and the occupants of the vehicle was consensual because the officers did not block the exit, did not draw their weapons or intimidate the occupants in any way, or demand that the occupants comply with the investigation. *Id.* at 983. In addition, the occupants did not attempt to leave. *Id.*

Just as in *Griffith*, Officer Woodward was on routine patrol in a high-crime area and approached a vehicle parked in a public place. In both cases, the patrol cars were parked so that the vehicles could be driven away unimpeded. The patrol car was 30 feet away in *Griffith* and two car lengths away in the instant case. In both cases, the window was apparently voluntarily opened for conversation with law enforcement. In fact, the tone was less cooperative in *Griffith* than in the instant case. No one failed to provide information or answer questions in this case. Officer Woodward did not take any documents from Smith or Defendant that required them to wait until the documents were returned or indicate that either person was the focus of an investigation. *See id.* at 983. Officer Woodward testified that he did not need to take identification because he was able

12

to identify the vehicle's occupants on sight.  Smith matched the photo he had just seen on his squad car computer, except for the hairstyle, and Officer Woodward immediately recognized Defendant and verified his name verbally.  Moreover, Officer Woodward was alone, did not touch Defendant or Smith, and did not display his weapon, or use language or tone of voice indicating that compliance with the officer's request might be compelled. Although Officer Woodward was in uniform with a firearm holstered at his side, "this fact is not to be afforded a great deal of weight . . . because the fact that most law enforcement officers are armed is well known to the public, [and] a holstered firearm is unlikely to contribute to the coerciveness of an encounter with police." *United States v. Steffens*, No. 19-CR-4022-LTS-KEM, 2019 WL 3304815, at *6 (N.D. Iowa July 23, 2019), *R. & R. adopted as modified*, 418 F. Supp. 3d 337 (N.D. Iowa 2019) (quoting *Vera*, 457 F.3d at 833) (brackets in original).

Thus, I find that the encounter began as a consensual encounter.  Smith and Defendant voluntarily engaged with Officer Woodward when there was no restraint on their freedom to leave.  Officer Woodward did not physically restrain their ability to drive away and did not impair Smith's ability to drive away by holding his driver's license.  Although it is true that "most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." *I.N.S. v. Delgado,* 466 U.S. 210, 216 (1984); *Vera*, 457 F.3d at 835 (same).  I recommend the District Court find that the encounter began as a consensual encounter.

## 2. *Officer Woodward had reasonable suspicion for an investigative stop when he saw the empty holster.*

Officer Woodward testified that as soon as he identified the occupants of the vehicle, he "immediately" saw the empty holster in the space in front of the gear shift, tried to locate the gun in the car, returned his gaze to the holster and saw the holster

13

covered with a piece of paper and Smith removing his hand from that area. In addition, he noticed that the zipper of Smith's pants was down. These things all sent Officer Woodward's "reasonable suspicion right out the window"[6] because the empty holster told Officer Woodward there was likely a gun in the car. The sudden appearance of the piece of paper and Smith's hand in the vicinity of the paper led him to believe Smith was trying to hide the holster. Smith's lowered zipper told Officer Woodward that Smith was hiding a gun somewhere in the vehicle because people who hide guns in their waistbands or their crotch area often unzip their pants in order to quickly access the guns so they can get rid of them. Officer Woodward also knew Smith was prohibited from having firearms because he is a convicted felon. He also believed Defendant was prohibited from having firearms because he was a drug user and because Officer Woodward did not believe Defendant had a weapons permit. Officer Woodward believed there was a firearm in the vehicle and that Defendant seemed to be targeting people.

"There is no bright line between a consensual encounter and a *Terry* stop, rather, the determination is a fact intensive one which turns upon the unique facts of each case." *United States v. Beck*, 140 F.3d 1129, 1135 (8th Cir. 1998) (citations omitted). A police officer may stop and briefly question a person if the officer has reasonable, articulable suspicion of criminal activity. *See Terry v. Ohio*, 392 U.S. 1, 21 (1968). Under the Fourth Amendment, reasonable suspicion requires more than a hunch that criminal activity is afoot. *Griffith*, 533 F.3d at 984; *Steffens*, 2019 WL 3304815, at *5. "To satisfy the Fourth Amendment, officers must be able to articulate some minimal, objective justification for a *Terry* stop." *Griffith*, 533 F.3d at 984 (citation omitted). The

---

[6]Officer Woodward's metaphor was not particularly apt. "Out the window" means "forgotten or disregarded; lost or wasted." https://idioms.thefreedictionary.com/out+the+window. From the context of his testimony and the fact that the investigation proceeded, I assume he meant something more like "through the roof," which means "to increase to a very high level." https://idioms.thefreedictionary.com/go+through+the+roof.

determination of whether an investigatory stop was justified is based on the totality of the circumstances. *Id.* at 983 (citing *United States v. Hughes,* 517 F.3d 1013, 1016 (8th Cir. 2008)). During a *Terry* stop, officers must "employ the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the *Terry* stop." *United States v. Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir. 1999) (citing *Florida v. Royer,* 460 U.S. 491, 500 (1983)). Officers may check for weapons and may take any additional steps that are "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *Id.* (quoting *United States v. Hensley,* 469 U.S. 221, 235 (1985)); *United States v. Sanford*, No. 14-CR-2036-LRR, 2014 WL 6680797, at *3 (N.D. Iowa Nov. 24, 2014) ("[T]he Eighth Circuit has held that, when there is a suspected crime of a dangerous nature and a 'good possibility' that the defendant had a weapon, 'the defendant's confinement with handcuffs in the back of a police car during [a search is] reasonably necessary to maintain the status quo, protect the officers, and allow them to conduct the search.'") (quoting *Navarrete–Barron,* 192 F.3d at 790) (second set of brackets in original), *aff'd*, 813 F.3d 708 (8th Cir. 2016). "It is well established . . . that when officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety." *United States v. Fisher*, 364 F.3d 970, 973 (8th Cir. 2004).

I find that based on the totality of the circumstances, Officer Woodward had reasonable, articulable, objective justification that criminal activity was afoot when he saw the empty holster, Smith's unzipped pants, and the evident efforts to hide the holster. Officer Woodward not only knew from his training and experience that the facts presented by the situation indicated the presence of a firearm, he also knew that both occupants of the vehicle were likely prohibited from possessing firearms. In addition, Officer

15

Woodward knew that the vehicle was parked in a high-crime area and had a view of a bar frequented by gang members where fights, drug deals, and even shootings were common at closing time, especially on Friday and Saturday nights. Officer Woodward also knew that Defendant had been showing interest in male bar patrons rather than female bar patrons who left the Briq House, and that Defendant had paid particular attention to members of the 400 Group, a gang that frequented the bar. Officer Woodward testified that he thought Defendant may have been targeting patrons of the Briq House on January 26.[7] The totality of these circumstances gave Officer Woodward reasonable suspicion that there was a gun in the vehicle and justified him calling for backup because, as he testified, "[F]or officer safety reasons, if there's a firearm in the vehicle and there's two people, you'd request backup and wait for at least another officer." *See Navarrete–Barron,* 192 F.3d at 790 (officers can take steps that are reasonably necessary for their protection and to maintain the status quo).

This situation is again analogous to *Griffin* where the officers were justified in "expanding the scope of the encounter to a *Terry* stop." 533 F.3d at 983. *Griffin* reasoned that because the vehicle was parked in an area known for drug trafficking, the

---

[7] On cross examination, Officer Woodward admitted that he could have seen Defendant doing a variety of things besides targeting patrons of the Briq House while moving forward and backward ten times, such as tying his shoes, looking at the stars, reaching into the glove compartment or for a knob or a drink, or dealing with a sore back or knee. These possible innocent explanations, however, did not require Officer Woodward to discount this information in assessing his suspicions. *See Terry*, 392 U.S. at 22 (reasoning that had the officer noticed defendants "go through a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation. . . . It would have been poor police work indeed for an officer of 30 years' experience in the detection of thievery from stores in this same neighborhood to have failed to investigate this behavior further."); *United States v. Stewart*, 631 F.3d 453, 457 (8th Cir. 2011) ("[F]actors that individually may be consistent with innocent behavior, when taken together, can give rise to reasonable suspicion, even though some persons exhibiting those factors will be innocent.") (citing *Carpenter*, 462 F.3d at 986).

occupants did not seem to be either entering or leaving the vehicle, the occupants observed the officers closely when they passed by, the driver gave conflicting reasons for her presence on the property and refused to identify the defendant, and the defendant reached under the front seat as if attempting to hide something, the totality of the circumstances justified a *Terry* stop to determine the defendant's identity. *Id.*

I further find that Officer Woodward's lie to Defendant that he was waiting for information to come back from Dispatch when he was actually waiting for backup was also a reasonably necessary step to maintain the status quo. Officer Woodward chose a method of "running down the clock" that was believable, that would not arouse suspicion, that would, in his words, keep the occupants of the vehicle "calm" and prevent them from getting "antsy." (Woodward Hr'g Test.) This was the least restrictive but effective manner in which to maintain the status quo given the facts of the situation. The occupants of the vehicle appeared calm and chatty, never asking to leave and inquiring as to the current levels of police pay. Moreover, because no girlfriend had yet arrived at the scene, it is possible that waiting for Officer Nichols to arrive did not, in fact, extend the occupants' time parked on Fifth Street. (Gov. Oral Arg. ("The evidence is that they were waiting to pick somebody up, so they weren't going anywhere anyway.").)

After Officer Nichols arrived and officers ordered Defendant and Smith to show their hands and drew their weapons, the encounter was still a *Terry* stop in spite of the show-of-force. Officers were entitled to secure Defendant in a squad car in handcuffs while they searched Smith's vehicle. *See Sanford*, 2014 WL 6680797, at *4 (finding detainment of defendant suspected of having a weapon in handcuffs in the back of a police car during search "reasonably necessary to ensure officer safety.")

Defendant argues that when "law enforcement thereafter refused Defendant the opportunity to leave, the seizure was converted to an arrest, without probable cause." (Doc. 32-1 at 6; Def. Oral Arg.) At the hearing, Defendant contended that he was

arrested when officers drew their guns on him. He argued, "To say that that was simply a *Terry* stop at that point, we strongly disagree with. . . . At that point that is an arrest and we would say that that's an arrest without probable cause for the same reasons they lacked reasonable suspicion at that point." (Def. Oral Arg.) As demonstrated above, in the Eighth Circuit, officers may draw their weapons during a *Terry* stop when it is necessary to maintain the status quo and to protect themselves so they can conduct a proper search. *See Fisher*, 364 F.3d at 973. I find that it was necessary for Officers Woodward and Nichols to do so in this case. As Government Exhibit 1 shows, just negotiating with Defendant how Officer Woodward was going to remove him safely from the vehicle while learning from Defendant whether the "gun" (it turned out to be two guns) under him was under the seat, in Defendant's clothing, or under Defendant's "butt," took all of Officer Woodward's attention. (Gov. Ex. 1 at 4:45-6:38.) In the meantime, he had instructed Officer Nichols to cover Smith, who was the original cause for concern due to his unzipped pants. (*Id.* at 4:14, 5:54.) The officers knew there was an AK-47 in the backseat. They were certainly not required to ignore the possibility that one of the vehicle's occupants could have reached for that firearm or that there were more firearms in the vehicle. *See Terry*, 392 U.S. at 33 (Harlan, J., concurring) ("There is no reason why an officer, rightfully but forcibly confronting a person suspected of a serious crime, should have to ask one question and take the risk that the answer might be a bullet."). Moreover, officers are allowed to detain suspects as long as "the scope of the detention [is] carefully tailored to its underlying justification, and the investigative methods employed [are] the least intrusive means reasonably available to verify or dispel the officers' suspicion in a short period of time." *United States v. Bell*, 480 F.3d 860, 864 (8th Cir. 2007) (quotations omitted). Here, the officers' suspected there were firearms in the vehicle. They already knew of at least one AK-47 in the vehicle and

employed the least intrusive means reasonably available under the circumstances to allow them to conduct the search necessary to dispel or verify their suspicions.

Accordingly, I find the encounter constituted a *Terry* stop that was supported by reasonable articulable suspicion from the time Officer Woodward saw the empty holster through the search of Smith's vehicle.

### 3. Defendant's arrest was supported by probable cause.

"Probable cause to make a warrantless arrest exists when police officers have trustworthy information that would lead a prudent person to believe that the suspect has committed a crime." *United States v. Sherrill*, 27 F.3d 344, 347 (8th Cir. 1994); *See also United States v. Newell*, 596 F.3d 876, 880 (8th Cir. 2010) (probable cause for arrest existed when officers saw bag of cocaine hanging out of defendant's pocket as they removed him from car during *Terry* stop); *Griffith*, 533 F.3d at 984 (probable cause existed to arrest defendant who was on trespass list and to search his vehicle). Here, probable cause existed to arrest Defendant when, as Officer Woodward testified, further investigation revealed that Defendant did not have a weapons permit. Thus, I find there was probable cause to arrest Defendant for illegally possessing two firearms.

Accordingly, based on the above discussion, I recommend the District Court deny Defendant's Motion to Suppress.

### 4. Whether the Stop was a Traffic Stop

Defendant relies on *United States v. Rodriguez*, 575 U.S. 348 (2015) and its progeny to argue that the entire January 26 encounter was a traffic stop from its inception and that Officer Woodward expanded the traffic stop beyond what was necessary to effectuate the purpose of the stop. (Doc. 32-1 at 4-6.) Defendant argues, "To the extent Officer Woodward base[d] his approach of the vehicle on the expired registration, that's a traffic offense. So if his purpose is to go up to the vehicle because of a traffic violation, then that is a traffic stop." (Def. Oral Arg.) Defendant is incorrect. While many traffic

stops are made for the purpose of investigating traffic violations, the fact that a traffic violation was the subject of an investigation does not necessarily mean a stop had been effected. A traffic violation could be investigated after an incident at a suspect's home, in a parking lot, or, as in this case, in a car parked voluntarily at the roadside. The mere fact that the investigation took place while the subject of the investigation was in a vehicle, does not make the encounter a traffic stop and, thus, a seizure. *See Williams v. Decker*, 767 F.3d 734, 739 (8th Cir. 2014) (reasonable suspicion for investigative stop existed when car was parked diagonally across two parking spaces and officer thought he observed driver drinking alcohol).

Defendant asserts that asking for identification, even if not taking driver's licenses, and asking what the occupants are doing are typical traffic stop questions and that Officer Woodward lacked reasonable suspicion at that point to conduct a traffic stop.[8] (*Id.*) The Government responds, "Here, there is no traffic stop and thus *Rodriguez* is inapplicable."[9] (Doc. 37 at 16.)

It is "well established that a traffic violation—however minor—creates probable cause to stop the driver of a vehicle." *United States v. Linkous*, 285 F.3d 716, 719 (8th Cir. 2002) (citations omitted). Under the Fourth Amendment, an investigative stop of an automobile is a seizure. *Wren v. United States*, 517 U.S. 806, 809-10 (1996). "A seizure for a traffic violation justifies a police investigation of that traffic violation." *Rodriguez*, 575 U.S. at 354. The constitutionally acceptable length of the seizure of the individual involved "is determined by the seizure's 'mission.'" *Id.* (citing *Illinois v.*

---

[8] Defendant argues that Officer Woodward's "simple act of knocking on the window is a show of authority." (Def. Oral Arg.) However, Officer Woodward cannot remember if he knocked on the window when he approached the vehicle. (Woodward Hr'g Test.) Officer Woodward's body camera was not recording at this point in the encounter. (*Id.*)

[9] At the hearing, the Government argued in the alternative that the stop was a good traffic stop supported by reasonable suspicion.

*Caballes,* 543 U.S. 405, 407 (2005)).  Stops may last no longer than necessary to allow officers to achieve their stated purpose.  *Id.* (citations omitted); *United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001).  "A seizure justified only by a police-observed traffic violation . . . 'becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission' of issuing a ticket for the violation." *Rodriguez*, 575 U.S. at 350-51 (quoting *Caballes*, 543 U.S. at 407) (brackets omitted)).  Whether an officer has reasonable suspicion to expand the scope of a stop is determined by looking at "the totality of the circumstances, in light of the officer's experience." *United States v. Carrate*, 122 F.3d 666, 668 (8th Cir. 1997) (citations and quotation marks omitted).

During a traffic stop, an officer may check a driver's license and registration, ask his destination and purpose, and ask him to step out of the car. *Linkous,* 285 F.3d at 719. Moreover, during a traffic stop, an officer "may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks" including a check of the driver's criminal history.  *United States v. Quintero-Felix*, 714 F.3d 563, 567 (8th Cir. 2013) (citation omitted); *Jones*, 269 F.3d at 924-25 (listing several tasks officers can legally perform on a traffic stop). While a vehicle is stopped, officers may extend inquiries into matters unrelated to the traffic stop, as long as doing so does not "measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).

What length of stop and investigation is necessary will vary based on the circumstances of each case.  An officer may detain a driver as long as reasonably necessary to conduct these investigative activities and to issue a warning or citation. *Jones,* 269 F.3d at 925 (citing *United States v. Wood,* 106 F.3d 942, 945 (10th Cir. 1997)). If, at any time during a reasonable traffic stop, an officer "develops a reasonable, articulable suspicion that a vehicle is carrying contraband," the officer may

21

expand his intrusion into issues unrelated to any traffic offense. *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005) (quotations omitted).

Here, even if I had decided the stop was a traffic stop from its inception, Officer Woodward had probable cause to "stop" Smith because Smith had an expired registration. It would make no difference if Officer Woodward used the expired registration as a pretext to investigate Defendant's unusual behavior and his concerns that Defendant was paying more attention to male bar patrons than female bar patrons exiting a bar known for gang-related violence. *United States v. Sallis*, 507 F.3d 646, 649 (8th Cir. 2007) (officers have probable cause to conduct traffic stops for minor traffic violations "even if a valid traffic stop is a pretext for other investigation") (quoting *United States v. Coney,* 456 F.3d 850, 855-56 (8th Cir. 2006) (quoting *Linkous,* 285 F.3d at 719)); *see also Whren,* 517 U.S. at 813 (holding that an officer's subjective intentions for conducting a traffic stop "play no role in ordinary, probable-cause Fourth Amendment analysis"). After Officer Woodward testified that it is a crime to have a vehicle with an expired registration on a public road, he and Counsel for the Government engaged in the following exchange:

> Q. And your purpose in approaching the vehicle was because of the fogged up windows, the expired registration, and what you described as furtive movements; is that right?
>
> A. Also, the paying attention to the patrons, definitely, when -- like I explained the females, he leaned forward and leaned back in the seat. They were parked far enough away where, yeah, you would probably have to lean forward and the windows are fogged up, so that would obviously make you have to lean forward more but he was paying attention to the males. He'd see a female and he'd immediately go back in his seat. When a male would exit the bar or go into the bar or when they would loiter outside, he would stay leaned up in his seat watching.

(Woodward Hr'g Test.) Officer Woodward engaged in the types of tasks usually performed during traffic stops, i.e., checking I.D.s, if only visually; and asking Dispatch to check criminal records and warrants. Officer Woodward also visually confirmed that the driver of the vehicle was Smith, the registered owner of the vehicle.[10]

Moreover, it is undisputed that Officer Woodward "immediately" saw the empty holster, which Smith covered with paper as soon as Officer Woodward turned his head. He also noticed that Smith's zipper was down. Officer Woodward's training and experience informed him not only that there was likely a gun somewhere in the vehicle, but also that Smith had tried to divert Officer Woodward's attention from the gun holster. As Officer Woodward testified, and as I found, above, at this point, Officer Woodward "develop[ed] a reasonable, articulable suspicion that a vehicle [was] carrying contraband." *Sanchez*, 417 F.3d at 975. This allowed Officer Woodward to expand his investigation into issues unrelated to any traffic offense.

I further find that Officer Woodward did not unreasonably prolong any traffic stop under *Rodriguez*. As discussed above, once Officer Woodward developed reasonable suspicion that there was a firearm in the vehicle, he could take any additional steps that were "reasonably necessary to protect [his] personal safety and to maintain the status quo during the course of the stop." *Navarrete-Barron*, 192 F.3d at 790. The fact that Officer Woodward did not write a citation or issue a warning to Smith for having an expired registration is of no consequence when Officer Woodward was suddenly faced with a more dangerous situation that required his full attention. *See United States v. Mendoza*, 677 F.3d 822, 826-28 (8th Cir. 2012) (dismissing defendant's argument that the Government failed to show what traffic laws he violated that led to traffic stop during which a drug dog alerted because officers' reports described defendant's conduct without

---

[10] Officer Woodward had Dispatch run warrant checks on Defendant and Smith at 2:05:28 and 2:07:48 a.m. (Gov. Ex. 3 at 1.)

citing the Iowa Code, therefore implying defendant did not receive a warning or citation for these violations). Moreover, Officer Woodward testified that writing a citation for the expired registration would likely have taken up to ten minutes, which is approximately six minutes longer than it took for Officer Nichols to arrive and find the AK-47. Officer Woodward called for backup at 2:06:21 a.m. and Officer Nichols arrived at 2:08:39 a.m. (Gov. Ex. 3 at 2.) Officer Nichols called for more officers because of the firearm in the vehicle at 2:10:13 a.m. (*Id.* at 1.)[11] In addition, Officer Woodward testified he could "handle" the registration violation at the end of the encounter after he had dealt with any other issues.

Therefore, even if the District Court finds that the encounter was a traffic stop, I recommend the Court also find there was probable cause for the stop because Smith had an expired registration. Moreover, I recommend the Court find that the stop was not unreasonably prolonged because Officer Woodward developed reasonable suspicion there was a firearm in the vehicle when he saw the empty holster and Smith's unzipped pants.

### 5. *Statements Defendant Made at the Waterloo Police Station*

Although I recommend that Defendant's motion be denied in all respects on two alternative bases, a colloquy I had with counsel for both parties at the suppression hearing requires some discussion.

At the hearing, the parties discussed whether the issue of suppressing statements Defendant made during his interview at the Waterloo Police Station as fruit of the poisonous tree is currently before the Court. Defendant argued, citing paragraphs 3 and 12 of his brief, that the statements were before the Court. (Def. Oral Arg.) The Government responded that because Defendant's brief was "vague," the Government did

---

[11] Defendant admits that Officer Woodward had reasonable suspicion for a *Terry* stop once Officer Nichols saw the AK-47 on the floor of the backseat. (Def. Oral Arg.)

not realize statements were at issue and therefore did not solicit testimony related to an attenuation analysis. (Gov. Oral Arg.)

There is currently no evidence before the Court related to statements Defendant made during his interview at the police station. Paragraph 3 of Defendant's brief is not related to this issue. However, paragraph 12 states, in pertinent part, "[A]ll evidence must be suppressed pursuant to the exclusionary rule and any resulting evidence and statements obtained are fruit of the poisonous tree." (Doc. 32-1 at 6 ¶ 12.) There is a footnote at the end of paragraph 12 that states that involuntary statements must be suppressed. (*Id.* at n.1.) Defendant argues that all statements were made following an "unconstitutional seizure, being held at gunpoint, and, later, after being formally arrested and taken to the police station for custodial interrogation." (*Id.*)

"The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 132 n.1 (1978), *abrogated in part on other grounds by Minnesota v. Carter*, 525 U.S. 83 (1998); *United States v. Houston*, 754 F. Supp. 2d 1059, 1071 (D.S.D. 2010) ("[T]he burden of proof is on the defendant who seeks to suppress evidence.") (citing *United States v. Phillips,* 540 F.2d 319 (8th Cir. 1976), *aff'd*, 665 F.3d 991 (8th Cir. 2012)). I find that to the extent any statements Defendant made at the Waterloo Police Station are before the Court, Defendant has not satisfied his burden on the issue because he has not explained what statements must be suppressed, has not addressed the attenuation issue, and has not proffered any reasons other than his disagreement with the original encounter with law enforcement that would justify suppressing statements. A boilerplate statement that "resulting evidence and statements" must be suppressed did not suffice to put the Government on notice as to what specific statements require suppression. Moreover, the Court does not know, for example, how

25

long after the arrest Defendant was interviewed or the other circumstances surrounding that interview.

As stated above, I have found that Defendant's encounter with law enforcement on January 26, 2020 began as a consensual encounter, became a *Terry* stop supported by reasonable justification, and finally led to an arrest that was supported by probable cause. In the alternative, I have also found that Defendant's encounter with law enforcement was a legal traffic stop that was not prolonged unnecessarily. Accordingly, there is no poisonous tree to bear fruit, which is another reason to deny this part of Defendant's motion.

**B.** **_Defendant's Motion to Dismiss on Basis of Second, Fifth, and Eighth Amendments_**

Defendant argues that the indictment must be dismissed for three reasons. First, 18 U.S.C. Section 922(g)(3) is unconstitutionally vague, both as applied to him and facially. (Doc. 33-1 at 3-11, 13-14.) Second, the statute violates the Second Amendment. (*Id.* at 11.) Third, the statute violates the Eighth Amendment. (*Id.* at 11-12.)

**1.** **_Defendant's as-applied challenge is premature._**

The Fifth Amendment to the United States Constitution provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. An "essential feature" of the due process guarantee is "[t]he prohibition of vagueness in criminal statutes." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018). A law is unconstitutionally vague if it (1) "fails to provide a person of ordinary intelligence fair notice of what is prohibited," or (2) "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008); *see also Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *United States v. Turner*, 842 F.3d 602, 604 (8th Cir. 2016) ("A criminal statute is unconstitutionally vague in violation of the Fifth Amendment due process clause if it

26

"fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement.") (quoting *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015)) (brackets in original).

Defendant argues that 18 U.S.C. Section 922(g)(3) is unconstitutional as applied to him: "The current and anticipated allegation of this case highlights the troubling nature of § 922(g)(3)'s ambiguities and its apparent scope. Defendant anticipates the allegations in this case will be asserted he had used—at some unknown time, in some unknown manner, in some unknown location—marijuana." (Doc. 33-1 at 13.) *United States v. Turner* recognized the statute's ambiguities and crafted a solution that applies to the case at bar:

> The phrase "unlawful user of . . . any controlled substance" in 18 U.S.C. § 922(g)(3) is not defined by statute and "runs the risk of being unconstitutionally vague without a judicially-created temporal nexus between the gun possession and regular drug use." *United States v. Turnbull,* 349 F.3d 558, 561 (8th Cir. 2003) (emphasis added), *vacated*, 543 U.S. 1099, 125 S. Ct. 1047, 160 L. Ed. 2d 993 (2005), *reinstated*, 414 F.3d 942 (8th Cir. 2005) (per curiam). In order to rule on Turner's as applied constitutional challenge, the district court therefore had to determine whether he had engaged in "regular drug use" at the time he possessed the firearm. The "facts surrounding the commission of the alleged offense" would assist with that determination, and the contested defense therefore could not be ruled upon without a "trial on the merits." *See Covington*, 395 U.S. at 60, 89 S. Ct. 1559; Fed. R. Crim. P. 12(b)(1).

842 F.3d at 605 (ellipses in original).

Generally, pretrial motions should be ruled on unless there is "good cause to defer the ruling." Fed. R. Crim. P. 12(d); *Turner*, 842 F.3d at 605. I find that good cause exists to defer ruling on this motion because the "facts surrounding the commission of the alleged offense" will assist in determining whether Defendant was a drug user within the meaning of the statute. *See Turner*, 842 F.3d at 605. Thus, Defendant's as applied

27

vagueness challenge should "not be ruled upon without a 'trial on the merits.'" *Id.* (citing *United States v. Covington*, 395 U.S. 57, 60 (1969); Fed. R. Crim. P. 12(b)(1)); *See also United States v. Stupka*, 418 F. Supp. 3d 402, 406 (N.D. Iowa 2019) ("[A] district court must wait until the facts of a case are fully developed at trial before ruling on an as-applied vagueness challenge.") (citing *Turner*, 842 F.3d at 605). Accordingly, I recommend the District Court hold this part of Defendant's motion in abeyance until the facts of the case are fully developed at trial.

### 2. 18 U.S.C. Section 922(g)(3) is not amenable to facial attacks.

"The Supreme Court takes a dim view of facial challenges to Congressional enactments." *United States v. Stephens*, 594 F.3d 1033, 1037 (8th Cir. 2010). Facial challenges to congressionally enacted laws are discouraged because such challenges invite judgment without fully-developed facts and consideration of situations not before the court. *Id.* (quoting *Sabri v. United States,* 541 U.S. 600, 608–09 (2004)). A defendant who cannot show that a law is vague in his own case cannot show that the law is impermissibly vague on its face. *See United States v. Bramer*, 832 F.3d 908, 909 (8th Cir. 2016).

In *United States v. Stupka*, the Honorable Leonard T. Strand, Chief Judge of this Court, addressed whether a defendant could bring a facial challenge to Section 922(g)(3). 418 F. Supp. 3d at 406. While acknowledging that the case law on the issue was "limited and unclear," *Stupka* found that facial void-for-vagueness challenges are allowed in two instances. *Id.* at 408. First, challenges "should be given special consideration when an allegedly vague statute impacts a fundamental right," particularly a First Amendment right. *Id.* (citing *Williams*, 553 U.S. at 304; *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999); *Kolender*, 461 U.S. at 358; *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)). Second, challenges should be given special consideration "when . . . the law is

28

so indefinite or standardless that it allows or encourages arbitrary or discriminatory enforcement." *Id.* at 409. After reviewing relevant case law, *Stupka* concluded,

> In short, it appears that facial challenges are permissible in some cases regardless of whether the law would be found unconstitutional as applied. First, facial challenges are more likely to be appropriate when a vague law impacts First Amendment or other fundamental rights. Second, facial challenges are more likely to be appropriate when a law is vague because it lacks sufficiently clear guidelines or is vague in a manner – either on its face or as interpreted – that poses a high risk of arbitrary enforcement. This does not necessarily mean that every void-for-vagueness argument that invokes protected fundamental rights or emphasizes arbitrary enforcement concerns warrants a facial review. However, the case law indicates that special consideration should be given to facial challenges under these circumstances, regardless of whether the defendant could prevail on an as-applied challenge.

*Id.* at 411–12.

Turning to the facial vagueness challenge to Section 922(g)(3), *Stupka* held that the defendant's case did not present the type of challenge "to fundamental constitutional rights that typically lead to a facial vagueness review." *Id.* at 412. The court noted that the statute makes it illegal for "an unlawful user of . . . any controlled substance" to possess a firearm. *Id.* (citing 19 U.S.C. § 922(g)(3)) (ellipses in original). *Stupka* reasoned that although possession of firearms is a constitutional right, possession of firearms by certain parties, such as felons, is not constitutionally protected. *Id.* (citing *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010)). Therefore, "there [was] no reason to believe that a facial review [was] warranted due to § 922(g)(3)'s potential infringement on a fundamental right." *Id.* *Stupka* also found that the statute did not present any particular arbitrary enforcement concerns that warranted facial review, noting that the defendant merely argued that such statutory terms as "unlawful" and "user" were vague and imprecise, which was "the exact type of an attack on language, rather than an attack on process" the Eighth Circuit addressed in *Bramer*. *Id.*

29

at 412 (citing *Bramer*, 832 F.3d at 909-10 ("Though it is plausible that the terms 'unlawful user' of a controlled substance and 'addicted to' a controlled substance could be unconstitutionally vague under some circumstances, Bramer does not argue, and has not shown, that either term is vague as applied to his particular conduct of possessing firearms while regularly using marijuana.")).

In the case at bar, Defendant is charged with being "an unlawful user of a controlled substance as defined in 21 U.S.C. § 802. . . ." (Doc. 3 at 2.) Similar to the defendant in *Stupka*, Defendant argues that "[s]tanding alone, this phrase covers an amorphous and indefinite set of acts and/or attributes" and cites the *Merriam-Webster Online Dictionary* and *Black's Law Dictionary* definitions of the phrase to prove his point. (Doc. 33-1 at 5, 6.) Furthermore, Defendant argues that "combining the meanings of this phrase with the alternative form of the statute (being 'addicted to' a defined controlled substance) is even more abstruse, rendering the provision an unconstitutional ambiguity." (*Id.* at 5.) Defendant also argues that "addicted to" lacks "a clear or workable definition," goes on to cite two dictionary definitions, the definition of "addict" from 21 U.S.C. Section 802 that he finds inadequate, and argues that attempting to read the phrases "unlawful user of" and "addicted to" from Section 922(g)(3) "together only compounds ambiguity." (*Id.* at 6-8.) Defendant also argues that the statute invites arbitrary enforcement. (*Id.* at 9-10.)

I agree with Judge Strand's thorough analysis in *Stupka* and see no reason to depart from it. Therefore, Defendant's attacks on the terms are without merit. Defendant has not proven that the terms "unlawful user" of a controlled substance and "addicted to" are vague as applied to the conduct of possessing firearms while being an unlawful user of a controlled substance. To the extent Defendant asserts that the timing of a defendant's controlled substance abuse is missing from the statute, what Defendant calls "the triggering event" (*Id.* at 5-6), those vagueness concerns are to be addressed through

30

clarifying or limiting instructions at trial.  *See Stupka*, 418 F. Supp. 3d at 413 (citing *United States v. Turnbull*, 349 F.3d 558, 561 (8th Cir. 2003) ("The term 'unlawful user' is not otherwise defined in the statute, but courts generally agree the law runs the risk of being unconstitutionally vague without a judicially-created temporal nexus between the gun possession and regular drug use."), *judgment vacated*, 543 U.S. 1099 (2005), *opinion reinstated*, 414 F.3d 942 (8th Cir. 2005)).  In the event a "close call" still exists even with a clarifying construction, any remaining concerns are "addressed, not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt." *Williams*, 553 U.S. at 305–06 (citing *In re Winship,* 397 U.S. 358, 363 (1970)).  Moreover, Defendant's argument regarding the definition of "addicted to" can also be addressed through clarifying instructions.  *Stupka*, 418 F. Supp. 3d at 413.  In fact, Eighth Circuit Model Jury Instructions provide definitions for the terms "unlawful user" and "drug addict." *Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit*, 6.18.922B, Drug User in Possession of Firearm (18 U.S.C. § 922(g)(3)  (2017  ed.),  http://www.juryinstructions.ca8.uscourts.gov/Criminal-Jury-Instructions-2017.pdf.

 Defendant argued at the hearing that requiring a citizen of reasonable intelligence to have the legal acumen to access model jury instructions in order to understand how a law applies to him proves that the law is vague on its face.  This argument is without merit.  An "unlawful user" is any person

> who is a current user of a controlled substance in a manner other than as prescribed by a licensed physician. The defendant must have been actively engaged in use of controlled substance[s] during the time he possessed the firearm but the law does not require that he used the controlled substance[s] at the precise time he possessed the firearm. Such use is not limited to the use of drugs on a particular day, or within a matter of days or weeks before, but rather that the unlawful use has occurred recently enough to indicate that the individual is actively engaged in such conduct. An inference that a person [was] [is] a user of a controlled substance may be drawn from

evidence of a pattern of use or possession of a controlled substance that reasonably covers the time the firearm was possessed.

*Id.*

Defendant need not access this jury instructions to comprehend what an "unlawful user" is. This instruction not only provides a common-sense definition, but also temporal standards that are reasonably inferred by anyone. Defendant also finds the definition of "drug addict" provided in 21 U.S.C. Section 802, which is the source of the definition used in the model jury instruction, inadequate. However, *Williams* provides that proof beyond a reasonable doubt addresses those concerns. 553 U.S. at 305–06. Likewise, proof beyond a reasonable doubt will address concerns Defendant has about the definition of "unlawful user." Moreover, *Stupka* reasoned that "it is important to remember that '[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is.'" 418 F. Supp. 3d at 412 (quoting *Williams*, 553 U.S. at 306) (brackets omitted).

Finally, Defendant argues that Section 922(g)(3) is subject to arbitrary enforcement. Defendant proffered the example of three celebrities, Whoopi Goldberg, Bill Maher, and Brad Pitt, who all publicly admit to owning guns and to smoking marijuana. (Doc. 33-1 at 9-10.) Defendant ignores the courts' required temporal nexus between the gun possession and drug use to convict under Section 922(g)(3). *See Turnbull*, 349 F.3d at 561; *Stupka*, 418 F. Supp. 3d at 413. Defendant has not shown how the celebrities' statements meet this required nexus. Moreover, as the Government argued at the hearing, whether prosecutors have discretion in pursuing charges is not the proper inquiry. The proper inquiry is whether the statute is so vague that it provides no guideposts to help guide or to reign in the Government from charging someone under the statute. *See Stupka*, 418 F. Supp. 3d at 405 ("A law is unconstitutionally vague due to

arbitrary enforcement concerns if it leaves judges, jurors or law enforcement 'free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case.'" (citing *Beckles v. United States*, ––– U.S. –––, 137 S. Ct. 886, 894 (2017) (quoting *Giaccio v. Pennsylvania*, 382 U.S. 399, 402–03 (1966)). I find that the elements of the statute are sufficiently defined so that any concern with arbitrary enforcement does not rise to the level necessary to render the statute unconstitutional. I recommend the District Court deny this part of Defendant's motion.

### 3. 18 U.S.C. Section 922(g)(3) does not violate the Second Amendment.

Defendant argues that Section 922(g)(3) violates the Second Amendment because it "imposes restrictions that go to the heart of the Second Amendment protections, extending so far as to preclude the ownership of handguns in the privacy of one's own home for self-protection purposes." (Doc. 33-1 at 11.) The Eighth Circuit addressed a facial constitutional challenge to the statute based on the Second Amendment in *United States v. Seay*, which was decided two years after the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008).[12] 620 F.3d 919 (8th Cir. 2010). *Seay* held:

> Nothing in Seay's argument convinces us that we should depart company from *every* other court to examine § 922(g)(3) following *Heller*. Further, § 922(g)(3) has the same historical pedigree as other portions of § 922(g) which are repeatedly upheld by numerous courts since *Heller*. *See* Gun Control Act of 1968, Pub. L. No. 90–618, 82 Stat. 1213. Moreover, in passing  § 922(g)(3), Congress expressed its intention to "keep firearms out of the possession of drug abusers, a dangerous class of individuals." *United States v. Cheeseman,* 600 F.3d 270, 280 (3d Cir. 2010), *pet. for cert. filed,* 78 U.S.L.W. 3731 (U.S. June 1, 2010) (No. 09–1470). As such, we find that § 922(g)(3) is the type of "longstanding prohibition[ ] on the possession of firearms" that *Heller* declared

---

[12] *District of Columbia v. Heller* held that the Second Amendment affords people the right to possess firearms in their own homes for self-defense and prohibitions on such ownership are unconstitutional, "[a]ssuming [persons are] not disqualified from the exercise of Second Amendment rights." 544 U.S. 570, 635 (2008).

presumptively lawful. *See* 128 S. Ct. at 2816–17. Accordingly, we reject Seay's facial challenge to § 922(g)(1).

*Id.* at 925 (gathering cases) (emphasis and alterations in original).

Defendant cites no precedent to the contrary. Therefore, Defendant's argument fails under *Seay*. I recommend the District Court deny this part of Defendant's motion.

### 4. 18 U.S.C. Section 922(g)(3) does not violate the Eighth Amendment.

Defendant argues that Section 922(g)(3) violates the Eighth Amendment. (Doc. 33-1 at 12.) Defendant asserts that Section 922(g)(3) "does not condition punishment on the requisite commission of any 'affirmative illegal act,'" but rather on a person's status. (*Id.*) The Eighth Circuit addressed a facial constitutional challenge to the statute based on the Eighth Amendment in *United States v. Letts*, 264 F.3d 787 (8th Cir. 2001). Just as Defendant does in the instant case, the defendant in *Letts* relied on the Supreme Court's decision in *Robinson v. California*, 370 U.S. 660 (1962), to argue that a violation of Section 922(g)(3) constituted an impermissible status offense that convicted a person of a crime simply because of his status as a drug addict. *Id.* at 790; Doc. 33-1 at 11-12. *Letts* held:

> Section 922(g)(3) targets the act of possessing a firearm, not a defendant's status as a drug user. *See United States v. Winchester,* 916 F.2d 601, 606 (11th Cir. 1990) ("The statutory language and legislative history of the Gun Control Act of 1968 [which includes § 922(g)] reveal that Congress' intent was to prohibit the possession of firearms by classes of individuals it deemed dangerous, rather than to punish persons solely for having a certain status under the law."). Where society has an interest in regulating a certain act, such as possessing a firearm, a statute that prohibits certain persons from committing that act does not violate *Robinson*'s ban on status crimes.

*Id.* at 790.

Defendant misconstrues the statute. The statute does not subject someone to criminal charges because of his status as a user of controlled substances or as an addict.

34

Rather, the statute targets a person's illegal possession of firearms. Therefore, Defendant's argument fails under *Letts*. I recommend the District Court deny this part of Defendant's motion.

## IV.   CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court deny Defendant's Motion to Suppress (**Doc. 32**) and **hold in abeyance in part and deny in part** Defendant's Motion to Dismiss on Basis of Second, Fifth, and Eighth Amendments (**Doc. 33**). Specifically, I recommend that the Court hold in abeyance Defendant's as-applied challenge under 18 U.S.C. Section 922(g)(3) and deny the motion in all other respects.

**To allow for an expedited final ruling**, objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) must be filed within **SEVEN (7) days** of the service of a copy of this Report and Recommendation. *See United States v. Vasquez-Martinez*, No. 6:05CR60016-001, 2006 WL 376474, at *8 (W.D. Ark. Feb. 9, 2006) (seven days for objections); *Kato Eng'g, Inc. v. Hanley*, 367 F. Supp. 3d 918, 925 (D. Minn. 2018) (referral order included order for expedited review of R. & R.).

Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 2nd day of September, 2020.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa