**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 20-CR-2020 CJW-MAR |
| vs. | **ORDER** |
| DANDRE MONTRELL GANTT, | |
| Defendant. | |

_____

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................ 2

II.   STANDARD OF REVIEW.............................................................. 2

III.  FACTUAL BACKGROUND ........................................................... 5

IV.   ANALYSIS...................................................................................... 9

      A.    Motion to Suppress ............................................................... 9

            1.    Nature of the Initial Encounter .........................................10

            2.    Point at which Seizure Occurred .......................................15

            3.    Lawfulness of Arrest .........................................................18

            4.    Suppression of Defendant's Statements ..............................20

      B.    Motion to Dismiss ...............................................................21

V.    CONCLUSION ..............................................................................23

1

## I.    INTRODUCTION

This matter is before the Court on defendant's objections (Doc. 51) to the Report and Recommendation ("R&R") (Doc. 48) of the Honorable Mark A. Roberts, United States Magistrate Judge.  On August 3, 2020, defendant filed both a Motion to Suppress and a Motion to Dismiss.  (Docs. 32 & 33).  The government timely resisted both motions.  (Docs. 36 & 37).  On August 19, 2020, Judge Roberts held a hearing on defendant's motions.  (Doc. 41).  On September 2, 2020, Judge Roberts issued an R&R recommending that the Court deny defendant's Motion to Suppress and hold in abeyance in part and deny in part defendant's Motion to Dismiss.  (Doc. 48).  On September 8, 2020, defendant filed his objections.  (Doc. 51).

For the following reasons, the Court **overrules** defendant's objections, **adopts** Judge Roberts' R&R without modification, **denies** defendant's Motion to Suppress, and **holds in abeyance in part and denies in part** defendant's Motion to Dismiss.

## II.    STANDARD OF REVIEW

The Court reviews Judge Roberts' R&R under the statutory standards found in Title 28, United States Code, Section 636(b)(1):

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

*See also* FED. R. CIV. P. 72(b) (stating identical requirements).  While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask.  Moreover, while the statute does not require the judge to review an issue de novo if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard.

2

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court may review de novo any issue in a magistrate judge's report and recommendation at any time. *Id.* If a party files an objection to the magistrate judge's report and recommendation, the district court must review the objected portions de novo. 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate[ judge]'s report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

De novo review is non-deferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991); *see also Doe v. Chao*, 540 U.S. 614, 620–19 (2004) (noting de novo review is "distinct from any form of deferential review"). The de novo review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94–1609, at 3, reprinted in 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect Section 636(b))). Thus, although de novo review generally entails review of an entire matter, in the context of Section 636 a district court's required de novo review is limited to "de novo determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1).

Consequently, the Eighth Circuit Court of Appeals has indicated de novo review would only be required if objections were "specific enough to trigger de novo review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger de novo review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate [judge]." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit Court of Appeals has

Case 6:20-cr-02020-CJW-MAR   Document 67   Filed 09/23/20   Page 3 of 23

concluded that general objections require "full de novo review" if the record is concise. *Id.* Even if the reviewing court must construe objections liberally to require de novo review, it is clear to this Court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Ass'n, Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996).

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996); *see also Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Federal Rule of Civil Procedure 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting de novo review with "clearly erroneous standard" of review, and recognizing de novo review was required because objections were filed).

The Court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) (citation omitted). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Med. Clinic, P.C.*, 498 F.3d 837, 847 (8th Cir. 2007), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a definite and firm conviction that a mistake has been committed," *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

4

Even though some "lesser review" than de novo is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this Court to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* FED. R. CIV. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, the Court believes one further caveat is necessary: a district court always remains free to render its own decision under de novo review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153–54. Thus, although a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and the district court may choose to apply a less deferential standard.

### III.    *FACTUAL BACKGROUND*

After reviewing the record, the Court finds that Judge Roberts accurately and thoroughly summarized the relevant facts in his R&R. (Doc. 48, at 3–8). Further, neither party objects to the R&R's factual findings. Thus, the Court adopts and incorporates below the R&R's factual findings without modification. (*Id.*) (original footnotes omitted).

> Officer Woodward testified at the August 19, 2020 suppression hearing. I found him to be a credible witness. Therefore, unless otherwise noted, the following findings have all been adduced from Officer Woodward's testimony. At approximately 1:30 a.m. on January 26, 2020, Officer Woodward parked his unmarked squad car on Fifth Street at Jefferson Street where he could observe the Briq House Bar and Grill ("the Briq House"). Although his black SUV was "unmarked," it had an interior

light bar, sirens, lights on the side mirrors, and police license plates.  It did not "blend in that well" and Officer Woodward thought someone behind him could tell it was a police vehicle.  Officer Woodward had driven by during the night and noticed "a lot of people coming and going" from the Briq House and many cars in parking lots adjacent to the Briq House, which often means they will "have problems" at closing time.  The Briq House is a "hot spot" for weapons violations, fights that spill out into the street, and recent shootings near bar closing time, which is 2:00 a.m.  The 400 Group, a gang that does "the bulk of the shootings in Waterloo," frequents the Briq House.  Friday and Saturday nights are the busiest nights for crime in Waterloo and 1:30 a.m. on January 26 was a Sunday morning, the "rollover" from a Saturday night.  From his location, Officer Woodward could see patrons leaving the Briq House.  He watched patrons come and go from the Briq House for about ten minutes.

As he was observing the Briq House, Officer Woodward noticed a vehicle parked approximately two car lengths behind him that had fogged windows and did not appear to be running.  Officer Woodward found this odd on such a cold night.  Officer Woodward did not know the temperature, but there was snow on the ground.  He noticed that the car was occupied by two men.  He also noticed that the passenger in the front seat, who was later identified as Defendant, was leaning backward and forward in his seat.  Officer Woodward thought the passenger looked familiar, but could not remember his name.  He could not identify the driver.  When someone exited the Briq House, Defendant would move forward as if to see who was leaving the bar.  If the person was a female, Defendant moved back quickly.  If the person was a male, Defendant stayed forward for a longer time and "paid more attention to the males."  Defendant's movements were not slight.  He would move two or three feet—when he went back in his seat, he would shift between "sit[ting] in an upright position [to] . . . pretty much almost flat."  Officer Woodward estimated Defendant shifted like this ten times.  Officer Woodward thought Defendant was showing interest in the males who were exiting the bar, but not the females.  This was concerning because of the number of fights, disorderlies, and shootings that occur at the bar at closing time.  Officer Woodward believed Defendant was targeting someone and that is why the vehicle was waiting near the bar.  At one point, Officer Woodward recognized two members of the ABA ("All About Action") Gang exit the Briq House.  ABA is a branch of the 400 Group.  Defendant appeared to watch the men cross the street.  Officer

Woodward observed Defendant's head movements as Defendant watched the men. Officer Woodward believed Defendant was "tracking" the men.

Officer Woodward could read the license plate of the vehicle in his rear-view mirror and ran it through his computer. He discovered that the vehicle was registered to Choroin Smith and that the vehicle's registration was expired. He then ran Smith's name through Shieldware, which provides local arrest-history, and discovered Smith was a felon who was convicted for shooting two people and was currently subject to a no-contact order. While searching these records, he saw a photograph of Smith. He could not see what the driver of the vehicle looked like.

At 2:03:49 a.m., Officer Woodward decided to make contact with the driver and informed Dispatch that he was doing so. (Gov. Ex. 3 at 1.) He waited about 30 more seconds before exiting his vehicle. At this point, Officer Woodward had been watching the vehicle for about 30 minutes. Officer Woodward initially registered the encounter as "suspicious call" in the call for service record. (*Id.*) Officer Woodward exited his vehicle, walked past Smith's vehicle on the sidewalk, and saw Defendant make "furtive movements" back and forth and "mov[e] frantically" when he saw Officer Woodward. Due to Defendant's behavior, Officer Woodward decided to approach the vehicle on the passenger side instead of the driver's side. Officer Woodward's stated that reasonable suspicion was "pretty high" before he left his squad car based on watching the passenger's behavior. Officer Woodward, in full uniform—including his holstered department-issued firearm—approached the passenger-side front window, which Defendant "barely rolled down." Smith identified himself to Officer Woodward. Defendant provided his first name, "Deandre," and Officer Woodward said, "Deandre Gantt?" Officer Woodward immediately recognized Defendant because in 2018, he had been part of a VCAT team that executed a search warrant at Defendant's residence. He also arrested Defendant in 2018 for possession of marijuana and released him. Officer Woodward later swore out a warrant for Defendant's arrest for possession of marijuana, second offense.

At 2:05 a.m., Officer Woodward radioed Dispatch for information about Defendant. Then Officer Woodward "immediately" saw an empty gun holster in front of the car's gear shift. Officer Woodward looked in the front and back seats as well as he could through the fogged side windows with his flashlight but could see nothing. When he looked back through the partially-opened front window, the holster was covered with a piece of paper and Smith was in the process of removing his right hand from the

7

area. Officer Woodward interpreted this as Smith's attempt to hide the holster. Officer Woodward also noticed that Smith's pants were unzipped. Because of his training and experience, the empty holster told Officer Woodward there was likely a gun in the car. Moreover, seeing Smith's zipper down raised Officer Woodward's suspicion "right out the window" that Smith was hiding a gun somewhere in the vehicle. Officer Woodward knew Smith was a felon and prohibited from having a firearm. Officer Woodward believed from his training and experience that people often unzip their pants so they can quickly access a gun hidden in their waistband or crotch area in an attempt to quickly get rid of the gun. Officer Woodward also knew Defendant was "a drug user, which would prohibit him from possessing a firearm." Moreover, as part of his job duties, he keeps track of who applies for weapons permits and he had not seen a permit for Defendant.

At this point, Officer Woodward believed that Defendant was possibly targeting someone and he was "99 percent sure" there was a firearm in the vehicle because Smith was hiding the holster. He also knew that Smith, a felon and Defendant, a drug user, could not possess firearms.

Officer Woodward did not want to pursue the investigation alone because there were two people in a vehicle with suspected firearms. For officer safety, he called for backup. While he waited for backup, he engaged in small talk with Defendant and Smith to prevent them from getting "antsy" and to "put their guard down." He said he was waiting on some information from Dispatch and, "Once they get back to me, I'll get you guys out of here, okay?" (Gov. Ex. 1 at 0:33-0:36.) Officer Woodward then asked if Defendant and Smith were up to anything "fun" that night. Smith said they were waiting for his girlfriend to get off work from a nearby hotel. Both Smith and Defendant remained in the vehicle and Smith offered Officer Woodward his driver's license, which Officer Woodward declined. (*Id.* at 1:30-1:36.) Officer Woodward did not take Smith's driver's license because he could tell Smith was the registered owner of the vehicle by looking at him and comparing him to the photo he had seen while going through records on his squad car computer.

Dispatch told Officer Woodward that neither Defendant nor Smith had any outstanding warrants. However, Officer Woodward told them, "[I'm] just waiting for our system that runs drivers' license [unintelligible] they're just waiting on that, so, who knows when that shit will – hopefully soon dude. I'm cold." (*Id.* at 2:30-2:40.) In fact, Officer Woodward was not waiting for any information from Dispatch, but was waiting for backup,

and wanted to keep Defendant and Smith calm and not raise any suspicions. Defendant, Smith, and Officer Woodward continued to engage in small talk about police officer pay. (*Id.* at 2:43-3:10.) During this entire time, both Smith and Defendant were cooperative and neither one stated that they wanted to leave or gave Officer Woodward any signs that they wanted to leave. (Woodward Hr'g Test.; Gov. Ex. 1.)

Waterloo Police Officer Charles Nichols arrived on scene in a marked patrol car at 2:08:39. a.m. (Gov. Ex. 3 at 2.) As Officer Nichols was approaching the driver's side of the vehicle, Officer Woodward said, "32," code for the presence of a gun. (Gov. Ex. 1 at 3:21.) Officer Woodward then told Defendant and Smith to keep their hands where he could see them and asked if there was a gun in the vehicle. (*Id.* at 3:23-3:51.) Smith answered, "If there is, it's my baby mama's," and told Officer Woodward that he would have to look for the gun himself because he did not know where it was. (*Id.* at 3:28-3:50.) Officer Nichols saw a spot on the back window that looked wiped clean, which made him think there was someone in the back seat. (Nichols Hr'g Test.) He shined his flashlight in the window and saw an AK-47 assault rifle. (*Id.*) He said to Officer Woodward, "Hey, AK in the back seat." (Gov. Ex. 2 at 1:02-1:07.) At that point, Officer Woodward believed the occupants of the vehicle were violating an Iowa statute that makes it illegal to transport a firearm inside a vehicle with ammunition in the magazine or chamber.

Although Defendant originally denied there were other firearms in the vehicle, he eventually admitted there was a gun underneath where he was sitting. (Gov. Ex. 1 at 5:57-6:23.) When Defendant was safely removed from the vehicle, Officer Woodward discovered that Defendant had been sitting on two guns. (*Id.* at 6:41.) Defendant was handcuffed and detained in Officer Woodward's patrol car while officers searched the vehicle. Defendant was arrested on weapons charges when it was confirmed that he did not have a weapons permit. Defendant was interviewed at the Waterloo Police Station.

## IV.    ANALYSIS

### A.    *Motion to Suppress*

In his Motion to Suppress, defendant argues that all evidence in the case must be suppressed because Officer Woodward's seizure of defendant was unsupported by reasonable suspicion or probable cause. (Doc. 32-1, at 3–6). Defendant argues his

9

interaction with Officer Woodward was an investigative traffic stop during which he was seized. (*Id.*, at 4–6). The government argues that the interaction was not a traffic stop but instead a voluntary encounter which only developed into a seizure upon reasonable suspicion. (Doc. 37, at 8, 12).

In his R&R, Judge Roberts found that the interaction between defendant and Officer Woodward was not a traffic stop, but instead began as a consensual encounter and developed into a seizure only after reasonable suspicion arose. (Doc. 48, at 13, 15–20). Judge Roberts found that Officer Woodward had reasonable suspicion to support the seizure after he saw the empty holster in the vehicle. (*Id.*, at 19). The holster, along with defendant's unzipped pants, his attempt to hide the holster, Officer Woodward's knowledge of defendant, and other evidence all supported such reasonable suspicion. (*Id.*, at 15–19). Judge Roberts also found that, even if a traffic stop did occur, Officer Woodward's decision to radio for backup did not impermissibly prolong the stop. (*Id.*, at 23). Finally, Judge Roberts found that defendant's arrest was supported by probable cause. (*Id.*, at 19). Thus, Judge Roberts concluded that defendant's statements need not be suppressed because no violation of his rights occurred. (*Id.*, at 26).

Defendant objects to each of Judge Roberts' legal conclusions. (Doc. 51, at 1). The Court will address each objection in turn.

### 1.     *Nature of the Initial Encounter*

Judge Roberts found that the initial interaction between defendant and Officer Woodward was a consensual encounter for purposes of the Fourth Amendment to the United States Constitution. (Doc. 48, at 9–13). Defendant attempts to rebut this conclusion by asserting that he was not seated in a public place but rather in the privacy of a vehicle parked on a public thoroughfare. (Doc. 51, at 2). Defendant contends that Officer Woodward's presence outside the passenger door of the vehicle constituted a show of authority and served to indicate to defendant that he was not free to leave. (*Id.*).

10

Defendant argues that Officer Woodward's "trappings . . . of authority"—combined with his physical presence and his request for identification from the vehicle occupants—constituted a show of authority that would cause a reasonable person to believe they were not free to leave. (*Id.*).

The Eighth Circuit recognizes three classes of police encounters: "(1) consensual communications involving no coercion or restraint, (2) *Terry* stops—minimally intrusive seizures that are significant enough to invoke the Fourth Amendment and must be supported by reasonable suspicion, and (3) full-scale arrests that must be supported by probable cause." *United States v. Flores-Sandoval*, 474 F.3d 1142, 1144–45 (8th Cir. 2007) (citing *Terry v. Ohio*, 392 U.S. 1, 20 (1968); *United States v. Johnson*, 326 F. 3d 1018, 1021 (8th Cir. 2003)). "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002) (citations omitted).

The touchstone for determining when a consensual encounter is transformed into a seizure is whether "a reasonable person would feel free to terminate the encounter." *United States v. Lopez-Mendoza*, 601 F.3d 861, 865 (8th Cir. 2010) (quoting *Drayton*, 536 U.S. at 201). "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal citations, quotations, and emphasis omitted). To prove that a seizure occurred as a result of a show of authority rather than physical force, a defendant must demonstrate that there was in fact a show of authority *and* that the defendant actually submitted to that show of authority. *Id.* Whether a law enforcement officer exercised a show of authority is a fact intensive inquiry and is determined by the "totality of the circumstances surrounding the

11

incident." *United States v. Johnson*, 326 F.3d 1018, 1021 (8th Cir. 2003). Some relevant factors to be considered by the Court include the number of officers present, display of a weapon by an officer, physical touching of the person by the officer, use of strong language or tone of voice, whether police impeded a person's egress, or whether the person attempted to leave. *United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008) (citations omitted). This inquiry is "necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988).

The Supreme Court has held "that mere police questioning does not constitute a seizure." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Thus, "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Id.* Further, a request to see identification is not a seizure "as long as the police do not convey a message that compliance . . . is required." *Id.*, at 435. The Eighth Circuit Court of Appeals has specifically held that an officer approaching a parked car and gaining the attention of its occupants alone is not a sufficient show of authority such that a reasonable person would believe they were not free to leave. *United States v. Barry*, 394 F.3d 1070, 1075 (8th Cir. 2005); *see also United States v. Vera*, 457 F.3d 831, 834, 836 (8th Cir. 2006) ("Absent a factual finding that [the officer] did more than request [the defendant] to exit his vehicle, provide his identification, and enter the patrol car, there is no basis to conclude that the encounter was anything more than consensual."). This is true even if the officer had a holstered firearm because most people would except law enforcement officers to be armed. *Drayton*, 536 U.S. at 20.

Prior to being approached by Officer Woodward, defendant had been sitting in a stationary vehicle for more than half an hour watching people leave the Briq House. When Officer Woodward began to interact with defendant, defendant remained seated in

12

the vehicle. Defendant made no effort to exit the vehicle or otherwise terminate the interaction with Officer Woodward. Indeed, Officer Woodward did not obstruct the ability of the driver to depart the scene nor did he issue any commands that could reasonably be construed as limiting defendant's ability to leave. At this point, Officer Woodward had not yet drawn his weapon. Officer Woodward was also the only officer present at this time. In short, neither Officer Woodward's mere presence nor his routine questioning meaningfully altered the condition of defendant's liberty. *See Drayton*, 536 U.S. at 200 (citations omitted). Put another way, at this point in the encounter, defendant's right to be free from unreasonable seizure had not been impeded in any way.

Defendant further asserts that—at the time of his initial approach—Officer Woodward lacked the reasonable suspicion of criminal activity necessary to justify a *Terry*-style seizure of defendant. (Doc. 51, at 3). Setting aside the fact that no reasonable suspicion was necessary at this point because no seizure had occurred, Officer Woodward in fact had ample justification to seize the vehicle and its occupants—including defendant. Based on his prior check, Officer Woodward knew that the vehicle registration was expired. Officer Woodward observed a person in the driver's seat and that the vehicle was on a public thoroughfare, placing the driver in violation of Iowa law.[1] "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).

Furthermore, Officer Woodward's observations of defendant's behavior over the course of his 30 minute surveillance of the vehicle—combined with the time of night, his prior knowledge of the location, gang activity in the area, the fact that multiple shootings

---

[1] Iowa Code Section 321.98 states in relevant part that "a person shall not operate . . . upon a public highway any vehicle required to be registered and titled under this chapter unless a valid registration card and registration plate or plates issued for the current registration year are attached to and displayed on the vehicle when and as required."

had occurred there recently, and the fact that the registered owner of the vehicle had been convicted of shooting two people—were more than sufficient to constitute the reasonable suspicion of criminal activity required to justify a brief *Terry*-style seizure of defendant to investigate that suspicion. Defendant is correct that "none of these indications are themselves criminal" and that no one fact or observation was "sufficient to rise to the level of reasonable, articulable suspicion." (Doc. 51, at 3). Reasonable suspicion analysis accounts for the *totality* of the circumstances, however. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). "[T]here could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot." *Reid v. Georgia*, 448 U.S. 438, 441 (1980) (per curiam). As Judge Roberts noted in his R&R, the circumstances of *Terry* itself involved "a series of acts, each of them perhaps innocent" when consider in isolation, "but which taken together warrant further investigation." (Doc. 48, at 16 n.7) (citing *Terry,* 392 U.S. at 22). Courts are required to consider all the circumstance under review, to include the training and experience of the officer present and the factual inferences drawn by the officer based on that experience. *Arvizu*, 534 U.S. at 274. The legality of defendant's observed behavior simply is not determinative of the officer's formulation of a reasonable suspicion of criminal activity.

Finally, certainty of criminal activity is not a requirement of reasonable suspicion. Indeed, the inquiry "falls considerably short of satisfying a preponderance of the evidence standard." *Id.* (citing *United States v. Sokolow*, 490, U.S. 1, 7 (1989)). Officer Woodward possessed significantly more information than a mere hunch and was under no obligation to be certain of criminal activity. The Court agrees with Judge Roberts' finding that no seizure occurred during Officer Woodward's initial interaction with defendant. Alternatively, if a *Terry* stop occurred, reasonable suspicion justified it. Accordingly, defendant's objections to these findings are overruled.

14

## 2.    *Point at which Seizure Occurred*

Judge Roberts found that Officer Woodward developed a reasonable suspicion of criminal activity to support a seizure once he observed the empty handgun holster on the center console of the vehicle.  (Doc. 48, at 13).  Defendant asserts that the presence of an empty handgun "holster does not rise to the level of reasonable suspicion" of criminal activity sufficient to justify a seizure of defendant.  (Doc. 51, at 3).

First, defendant argues this case in the context of a traffic stop.  (Doc. 32-1, at 4–5).  Although the facts of this case involve an automobile, this was categorically not a traffic stop.  By calling this a traffic stop, defendant implies that it is a per se seizure which must be justified by at least reasonable suspicion.  *See United States v. Whren*, 517 U.S. 806, 809–10 (1996) ("Temporary detention of individuals during the stop of an automobile . . . even if only for a brief period . . . constitutes a seizure within the meaning of" the Fourth Amendment) (internal citations and quotations omitted).  To seize a *moving* automobile, an officer must exercise some combination of physical force or a show of authority.  *Delaware v. Prouse*, 440 U.S. 648, 657 (1979).  In other words, people subject to traffic stops are necessarily 'seized', even if just briefly.

By contrast, a person whose liberty has not been restrained "by means of physical force or show of authority. . . intentionally applied" has simply not been seized.  *Brendlin*, 551 U.S. at 254.  This is true whether the person is walking down the sidewalk, standing in a phone booth, or sitting in a parked car.  *United States v. Barry*, 394 F.3d 1070, 1075 (8th Cir. 2005) (holding that an officer parking fifteen feet in front of a suspicious vehicle in an alley at night, approaching the vehicle, keeping his hand on his holstered weapon, and knocking on the driver-side window did not constitute a seizure); *United States v. Leiva*, No. 19-CR-79-CJW-MAR, 2020 WL 556400 at *7 (N.D. Iowa Feb. 4, 2020) (holding that no seizure occurred where armed officer in uniform pulled alongside defendant's vehicle and shined her flashlight into vehicle).  This Court made

15

clear in *Leiva* that an armed and uniformed officer does not seize a person simply by asking questions or requesting to see identification. *Id.* (citing *Bostick*, 501 U.S. at 435). Officer Woodward exerted no physical force on defendant and made no show of authority. It is therefore incorrect, as a matter of law, to assert that this interaction was a traffic stop simply because a vehicle was involved. This also disposes of defendant's assertion that the stop was unnecessarily prolonged. (Doc. 51, at 3). If there was no stop, the stop could not be prolonged.

Secondly, defendant is incorrect that the presence of an empty handgun holster by itself does not justify a seizure. It is logical to infer that where there is a pistol holster there is also a pistol somewhere nearby. *United States v. Navarette*, No. 1:18-CR-115, 2019 WL 1779564, at *4 (D.N.D. April 23, 2019) ("Where one finds an ammunition clip for a gun and an empty holster for a gun, one might reasonably expect to find a gun as well."); *United States v. Dukes*, No. 15-20769, 2016 WL 3661908, at *7 (E.D. Mich. July 11, 2016) (finding that presence of empty pistol holster in vehicle "gave rise to the reasonable suspicion that the pistol having once resided in that holster may well be secreted somewhere within the vehicle, or even within the immediate reach of the passenger."). Iowa law prohibits the transportation of handguns in vehicles without a valid permit to carry weapons.[2] The presence of the holster, therefore, gave rise to a reasonable inference that a crime was being committed. Officer Woodward was thus entitled to seize defendant—even if just briefly—to investigate this suspicion. It may have been the case that there was no handgun present, or that defendant was lawfully permitted to carry weapons. As discussed above, the possibility of an innocuous or perfectly legal explanation is not relevant to the question of whether reasonable suspicion of criminal activity exists justifying a seizure to investigate.

---

[2] Iowa Code Section 724.4 states in relevant part that "a person . . . who knowingly carries or transports in a vehicle a pistol or revolver, commits an aggravated misdemeanor."

Additionally, Officer Woodward did not observe the holster in a vacuum. The presence of the empty holster must also be considered in the context of the other relevant aspects of the situation. Prior to approaching the vehicle, Officer Woodward had determined that the registered owner of the vehicle was one Choroin Smith ("Smith"). Officer Woodward cross-referenced Smith in the criminal database and discovered that Smith was a felon with firearm-related convictions. The criminal database also produced a photograph of Smith. Using this photograph for reference, Officer Woodward confirmed that the driver was in fact Smith. Further, Officer Woodward was able to positively identify the passenger—defendant—and knew from previous interactions with defendant that he was a drug user. Thus, at the moment that Officer Woodward observed the empty handgun holster on the center console, he knew that no one in the vehicle could legally possess a firearm. Considered, as it must be, in the context all other relevant details of this circumstance—the background knowledge Officer Woodward had about the area, the violent activities that had occurred there recently, the time of night these observations took place, the suspicious nature of defendant's own behavior prior to being contacted by Officer Woodward, as well as the driver's unzipped pants and what Officer Woodward construed to be an effort to hide the holster—the presence of the empty holster amply justified a brief seizure of defendant for further investigation.

Officer Woodward did not actually seize defendant, however, until Officers Woodward and Nichols drew their weapons. Although Officer Woodward had a reasonable suspicion of criminal activity that *would* have justified a seizure of defendant— and was in fact conducting a surreptitious investigation to allay that suspicion—no seizure actually occurred while Officer Woodward waited for support to arrive. It was not until the officers drew their weapons and began to issue commands to defendant and Smith that defendant's liberty was restrained sufficient to constitute a seizure. Everything leading up to that point was a consensual encounter between defendant and Officer

Woodward. Any evidence obtained by Officer Woodward during this time was gathered in accordance with Fourth Amendment constraints and is not subject to exclusion. Defendant's objection to this finding is overruled.

### 3. *Lawfulness of Arrest*

Judge Roberts found that Officer Woodward's arrest of defendant was supported by probable cause, did not require a warrant, and did not violate defendant's Fourth Amendment rights. (Doc. 48, at 19). Defendant objects to that finding and asserts that 1) defendant was illegally seized by Officer Woodward, and 2) any seizure that may arguably be found to be justified was impermissibly prolonged by Officer Woodward. (Doc. 51, at 3–4). As defendant would have it, these facts justify the exclusion of evidence discovered after the seizure. (Doc. 32-1, at 6).

"Probable cause to make a warrantless arrest exists when police officers have trustworthy information that would lead a prudent person to believe that the suspect has committed a crime." *United States v. Sherrill*, 27 F.3d 344, 347 (8th Cir. 1194). "The probable cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (internal citations and quotations omitted). "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." *Brinegar v. United States*, 338 U.S. 160, 176 (1948) (internal citations and quotations omitted).

Officer Woodward and Officer Nichols had probable cause to arrest defendant when Officer Nichols observed a rifle in the backseat of the vehicle. As discussed above, defendant was not seized at the time the observation occurred. Once Officer Nichols arrived and observed the rifle, the reasonable suspicion that a firearm was in the vehicle became probable cause that both defendant and the driver were illegally in possession of a firearm. *Pringle*, 540 U.S. at 372–73. In *Pringle*, the defendant and two other men

were stopped in a vehicle by police. *Id.* at 371–72. The defendant was seated in the front passenger seat. *Id.* at 366. A search of the vehicle revealed cocaine in the back-seat armrest. *Id.* at 372. Notably, the cocaine was located where it was accessible to all three men in the vehicle. *Id.* None of the passengers confessed to possessing the cocaine, so police charged all three of them with possession. *Id.* The United States Supreme Court held that officers could reasonably infer "that any or all of the occupants had knowledge of, and exercised dominion and control over, the cocaine." *Id.* It followed that "a reasonable officer could conclude that there was probable cause to believe [defendant] committed the crime of possession of cocaine, either solely or jointly." *Id.*

Here, as in *Pringle*, possession of contraband located in a place where it is readily accessible to everyone in the vehicle was fairly attributable to everyone in the vehicle. Police at that point had probable cause sufficient to arrest both occupants of the vehicle. In the moments that followed the observation of the rifle, while the officers were attempting to safely effectuate the arrest of the occupants, defendant admitted that there was a gun underneath him. "Once defendant was removed from the vehicle, Officer Woodward discovered that defendant had been sitting on two guns." (Doc. 48, at 8). Whatever may be argued about the possession of the rifle, defendant unquestionably "had knowledge of, and exercised dominion and control over" the firearms he was sitting on. Defendant was formally arrested when it was confirmed that he did not have a valid license to carry weapons. (*Id.*). From the moment that Officer Nichols observed the rifle in the backseat of the vehicle to the point where defendant is formally arrested, every action taken by Officers Woodward and Nichols was carefully tailored to effectuate a lawful arrest based on probable cause while ensuring the safety of both the officers present as well as that of the suspects at the scene. Defendant's objection to this finding is therefore overruled.

19

### 4. Suppression of Defendant's Statements

Defendant moved to suppress his statements to Officer Woodward—both at the scene of the arrest and later at the police station—as fruit of the poisonous tree flowing from an illegal seizure. There was some debate as to whether defendant's initial motion actually raised the issue of defendant's statements. (Doc. 48, at 24–25). Judge Roberts found that defendant's failure to specify which statements should be suppressed—or to argue the issue with anything more than "[a] boilerplate statement that 'resulting evidence and statements' must be suppressed"—was insufficient to provide proper notice to the government as to which issues were being argued. (*Id.*, at 25) (quoting Doc. 32-1, at 6). After all, "the burden of proof is on the defendant who seeks to suppress evidence." *United States v. Houston*, 754 F.Supp.2d 1059, 1071 (citing *United States v. Phillips*, 540 F.2d 319 (8th Cir. 1976)). Further, Judge Roberts found that because the seizure of defendant did not offend the Fourth Amendment, any statements made by defendant during or after the seizure need not be suppressed. (*Id.*, at 26).

A defendant seeking suppression must do more than baldly assert a violation of the Fourth Amendment. *See United States v. Stevenson*, 727 F.3d 826, 831 (8th Cir. 2013) ("Where a defendant offers only conclusory allegations in support of a motion to suppress, and where those allegations are unsupported by any citation to the record, a district court does not abuse its discretion by refusing to hold an evidentiary hearing."). Even in a circumstance where the government ultimately bears the burden of persuasion, defendant must—at the very least—make a prima facie showing of illegality. *United States v. de la Fuente*, 548 F.2d 528, 534 (5th Cir. 1977). Here, defendant has made no such showing with respect to any statements defendant may have made. The Court cannot suppress evidence based on nothing more than a naked allegation of illegality. Defendant's objection on this issue is therefore overruled.

### B.   Motion to Dismiss

Defendant also moved to dismiss the indictment.  (Doc. 33).  Defendant argued that the Court should dismiss the indictment because Title 18, United States Code, Section 922(g)(3) is unconstitutionally vague, both as applied to him and facially.  (Doc. 33-1, at 3-11, 13-14).  Defendant also argued that the statute violates the Second Amendment to the United States Constitution.  (*Id.*, at 11).  Finally, defendant argued that the statute violates the Eighth Amendment.  (*Id.*, at 11-12).

Judge Roberts found that defendant's as-applied vagueness challenge is premature.  (Doc. 48, at 26-28).  Judge Roberts found good cause to defer ruling on the motions because the facts surrounding the commission of the offense are necessary for the Court to determine if defendant had engaged in "regular drug use" at the time defendant possessed the firearm.  (*Id.*, at 27).  Judge Roberts concluded that defendant's as-applied vagueness challenge requires a trial on the merits for the Court to have an adequate factual basis to rule.  (*Id.*, at 28).  In his objections to Judge Roberts' R&R, defendant does not challenge this conclusion.  (Doc. 51).  The Court further notes that since Judge Roberts filed his R&R, the parties have waived jury trial and agreed to submit this case to the Court on a stipulated record so the Court can make the necessary findings to rule on this portion of defendant's motion.  Accordingly, the Court affirms Judge Roberts' R&R in this regard and holds in abeyance, until a trial on the merits, its ruling on defendant's as-applied vagueness challenge to the indictment.

In addressing defendant's vagueness facial challenge to the statute, Judge Roberts relied on this Court's prior ruling in *United States v. Stupka*, 418 F. Supp. 3d 402 (N.D. Iowa 2019), finding that a facial review was unwarranted and the statute did not present any particular arbitrary enforcement concerns.  (Doc. 48, at 28-29).  Judge Roberts further found that any potential vagueness as to the timing of defendant's drug use is properly addressed through proper jury instructions.  (*Id.*, at 29-31).  In short, Judge

Roberts found "the elements of the statute are sufficiently defined so that any concern with arbitrary enforcement does not rise to the level necessary to render the statute unconstitutional." (*Id.*, at 33). In his objection to this portion of Judge Roberts' R&R, defendant merely relies on "the arguments previously made" to Judge Roberts. (Doc. 51, at 4-5). Defendant does not identify any error in Judge Roberts' legal reasoning and the Court finds none. Accordingly, the Court overrules defendant's objection to Judge Roberts' R&R in this regard and adopts Judge Roberts' conclusion that the statute is not unconstitutionally vague on its face.

Judge Roberts also concluded that Title 18, United States Code, Section 922(g)(3) does not violate the Second Amendment to the United States Constitution. (Doc. 48, at 33-34). Judge Roberts noted that in *United States v. Seay*, 620 F.3d 919, 925 (8th Cir. 2010), the Eighth Circuit Court of Appeals rejected this very argument. (*Id.*). Defendant cited no binding precedent to the contrary to Judge Roberts, and in his objections to Judge Roberts' R&R defendant does not object to Judge Roberts' finding on this issue, other than making a general note of objecting "to each" of Judge Roberts findings without offering any additional support for his claim. (Doc. 51, at 4-5). Thus, defendant has abandoned this challenge to the statute. Regardless, the Court finds that it is bound by the Eighth Circuit Court of Appeals' decision in *Seay*. Thus, the Court finds that Title 18, United States Code, Section 922(g)(3) does not violate the Second Amendment to the United States Constitution and denies defendant's motion to dismiss on that ground.

Finally, Judge Roberts found that Title 18, United States Code, Section 922(g)(3) does not violate the Eighth Amendment to the United States Constitution. (Doc. 48, at 34-35). Again, Judge Roberts relied on binding precedent from the Eighth Circuit Court of Appeals rejecting the identical argument and finding that Section 922(g)(3) does not punish people for their status, but rather, punishes them for possession of a firearm. (Doc. 48, at 34) (citing *United States v. Letts*, 264 F.3d 787, 790 (8th Cir. 2001)). Again,

defendant did not object to this portion of Judge Roberts' R&R (Doc. 51, at 4-5) and therefore waives this ground for his motion to dismiss. Regardless, the Court finds the *Letts'* decision binding on this Court. Thus, the Court finds Section 922(g)(3) does not violate the Eighth Amendment to the United States Constitution and denies defendant's motion to dismiss on that ground.

## V. CONCLUSION

For the reasons set forth above, the defendant's objections (Doc. 51) are **overruled,** the Report and Recommendation (Doc. 48) is **adopted**, defendant's Motion to Suppress (Doc. 32) is **denied**, and defendant's Motion to Dismiss (Doc. 33) is **held in abeyance in part and denied in part**.

**IT IS SO ORDERED** this 23rd day of September, 2020.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

23